UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------X
RAYMIS KIMBERLEY RUIZ and JOHN MESSING, JR.,

                Plaintiffs,                                **MEMORANDUM**
                                                              **AND ORDER**
                                           18-CV-280 (RRM)

    - against –

BAY SHORE – BRIGHTWATERS RESCUE AMBULANCE,
INC., FELIX RODRIGUEZ, JOSEPH A. FRISINA, CHARLES
CHAPMAN, ALEX MULLIN,

                Defendants.
-----------------------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

        The plaintiffs, Raymis Kimberly Ruiz and John Messing, Jr., former volunteers with

defendant Bay Shore – Brightwaters Rescue Ambulance, Inc. ("BSBRA"), a privately owned,

non-profit volunteer ambulance company that provides emergency medical services in Suffolk

County New York, (Def.'s 56.1 Counterstatement ("Def.'s Reply to Pl.'s 56.1") (Doc. No. 42-1)

at ¶¶ 1–4), brought this suit for sexual discrimination against four fellow volunteers: Chief Felix

Rodriguez, First Assistant Chief Joseph A. Frisina, Third Assistant Chief Charles Chapman, and

Captain Alex Mullin.  (Def.'s Reply to Pl.'s 56.1 at ¶ 5.)  Defendants now seek summary

judgment on Raymis Kimberley Ruiz's claims of hostile workplace sexual harassment under

Title VII, 42 U.S.C. §§ 2000e *et seq.*, and the New York State Human Rights Law ("NYSHRL"),

N.Y. Exec. Law § 296; her claims of retaliation under the same statutes for her complaining of

the hostile workplace; and John Messing Jr.'s claim of retaliation under the same statutes for his

complaining of the hostile workplace to which Ruiz was subjected.  For the reasons explained

below, the motion is granted in part and denied in part.

# BACKGROUND

## I.    Factual Background

The following facts are drawn from plaintiffs' and defendants' Rule 56.1 Statements,
Plaintiffs' 56.1 Counterstatement, Defendants' Response to Plaintiffs' Counterstatement, and the
factual record.  Unless the source is otherwise qualified as testimony or other evidence, the facts
are undisputed.

### A.    Ruiz's Relationships and Background of BSBRA

Ruzi and Messing volunteered with BSBRA starting in 2015 and 2011 respectively,
(Def.'s Reply to Pl.'s 56.1 at ¶¶ 2–4.)  Ruiz, who began volunteering when she was 19, was a
crew chief during the times relevant to this complaint.  (Pl.'s 56.1 Counterstatement (Doc. No.
41)[1] at ¶ 78); (Def.'s Reply to Pl.'s 56.1 at ¶ 78.)  The defendants Felix Rodriguez, Joseph A.
Frisina, and Charles Chapman were chiefs of the BSBRA during the events alleged in the
complaint.  (Def.'s Reply to Pl.'s 56.1 at ¶ 5.)  Mullin is a member of BSBRA and Ruiz's former
friend.  (Def.'s Reply to Pl.'s 56.1 at ¶ 6.)

Prior to the events of this complaint, in the fall of 2015, at a gingerbread house contest
that BSBRA held, one entry featured a house by a crew of BSBRA members (not involved in the
instant dispute) with the words "Sexual Harassment in Progress" written on its roof.  (Pl.'s Ex.
CC (Doc. No. 41-37).)  The house also featured gummy bears in sexual positions.  (Pl.'s Ex. C at
66:16–20.)  It was displayed for a week.  (Pl.'s Ex. C at 56:14–20.)  Kunz informed Rodriguez
and believes that she informed Frisina as well, who told her not to worry, as it would be
"handled."  (Pl.'s Ex. C at 56:15–18.)  Ruiz saw the display but did not complain because she
was a probationary member.  (Pl.'s Ex. A-2 at 190:7–14.)

---

[1] The counterstatement begins at ECF page 55.

In 2015 or possibly an earlier year, Kunz recalls that at the BSBRA annual officer installation party, Mullin grabbed a BSBRA member, April Johnson, and kissed her in front of her then-fiancé.  (Pl.'s Ex. C at 116.)  Johnson informed Kunz of this event immediately after it happened.  (Pl.'s Ex. C at 120.)  Ruiz was aware of this incident.  (Pl.'s Ex. A at 54–55.)  Kunz also recalls that in either 2014 or 2015 at the same annual party, Mullin chased and grinded his body up against a non-member guest against her will.  (*Id*. at 115–17.)

While there is some evidence that Chapman engaged in an inappropriate exchange of text message with Ruiz, Ruiz ultimately concedes that Chapman did not harass her during this exchange.  During her tenure at BSBRA, Ruiz regularly exchanged texts with Chapman. ((Def.'s Reply to Pl.'s 56.1 at ¶ 10).  Ruiz sent Chapman some memes with sexually explicit jokes during the time they communicated.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 13.)  Chapman also admits that he reciprocated with racially charged memes.  (Pl.'s Ex. F at 66–69.)  Chapman expressly requested that Ruiz send the memes, despite having had anti-harassment training, and admits that it was "very wrong" of him to request them of Ruiz.  (Pl.'s Ex. F at 67:18–22.)  He also admits to sending Ruiz photos of himself in the shower and asking her to send nude pictures of herself.  (*Id*. at 71:3–5); (Pl.'s Ex. HH (Doc. No. 41-42) at 2–11.)  Ruiz willingly participated in this exchange, which did not make her feel uncomfortable.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 15.)

Similarly, with Mullin, while there is some evidence of an inappropriate exchange, Ruiz ultimately concedes that the exchanges were not harassing.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 27.) Ruiz and Mullin were friends on social media, communicated often via text message and, at least before the events of October 2016, were friends.  (Pl.'s Resp. to Def.'s 56.1 at ¶¶ 22–24, 43.) Though Ruiz sent Mullin memes that might be seen as flirty or sexual, Mullin admitted that Ruiz did not seriously intend to communicate a sexual interest in him and never said that she wanted

to be with him.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 26); (Pl.'s Ex. E (Doc. No. 41-13) at 210:10–12.)
The two did not have any sort of sexual relationship.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 29.)

Ruiz and Second Assistant Chief April Kunz are friends and were personal friends who
interacted outside of the workplace during the time periods relevant to the instant motion.  (*See*
Pl.'s Resp. to Def.'s 56.1 at ¶¶ 17–18.)

## B.    The Election

In the fall of 2016, Mullin campaigned for Second Assistant Chief of BSBRA against
incumbent Kunz.  (Pl.'s Resp. to Def.'s 56.1 at ¶¶ 21, 31.)  Before this time, he was a Captain.
(Def.'s Reply to Pl.'s 56.1 ¶ 35.)  The campaign was hotly contested.  (Pl.'s Resp. to Def.'s 56.1
at ¶ 32.)  Kunz asked Ruiz to seek votes for Kunz's Assistant-Chief campaign.  (Pl.'s Ex. A-2
(Doc. No. 41-4) at 148:2–10.)  The first election was held in September 2016, but neither
candidate had enough votes, and no winner was declared.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 33.)
Likewise, no winner was declared at the second runoff later that month.  (Pl.'s Resp. to Def.'s
56.1 at ¶ 34.)  Kunz was declared the winner at the third runoff on the first Monday of October.
(Pl.'s Resp. to Def.'s 56.1 at ¶ 35.)  During the election, members of Mullin's Saturday crew
generally supported Mullin, while members of Kunz's Friday crew generally supported Kunz.
(Pl.'s Resp. to Def.'s 56.1 at ¶ 91.)

During the election season, a rumor spread amongst the BSBRA membership that Ruiz
was sleeping with members to get votes for Kunz.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 36.)  Ruiz
found out through other members that Mullin was spreading this rumor, (Def.'s Reply to Pl.'s
56.1 Counterstatement (Doc. No. 42-1) at ¶ 77), and complained to Kunz about Mullin's actions.
(Pl.'x Ex. C at 162:15–20.)  Fudge heard the rumors circulating.  (Pl.'s Ex. D at 134:3–4.)  Chief

Rodriguez was aware that Ruiz "confided" in Kunz and Fudge about the rumors.  (Pl.'s Ex. G (Doc. No. 41-5) at 15.)

### C.      The Flagpole Incident

In an attempt to get Mullin to admit to spreading the rumor about her, Ruiz invited Mullin to speak with her on October 18, 2016, at a flagpole outside of the BSBRA facility.  (Pl.'s Resp. to Def.'s 56.1 at ¶¶ 41–42, 47.)  At the recommendation of Kunz, (Pl.'s Resp. to Def.'s 56.1 at ¶ 39), Ruiz recorded part of the discussion.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 46.)  Kunz explained that she made this recommendation in order to prevent Mullin twisting Ruiz's words. (Pl.'s Ex. C at 175:5–13.)

Certain facts about the flagpole incident are undisputed.  Ruiz confronted Mullin with the rumor during the flagpole conversation, and in response he laughed and dismissed the rumor as funny.  (Def.'s Reply to Pl.'s 56.1 Counterstatement at ¶ 82.)  Mullin thought that the discussion was a good time to clear the air between them.  (Def.'s Reply to Pl.'s 56.1 Counterstatement at ¶ 72.)  He told Ruiz that he had wanted to date her in the past, and that he had liked her in the past. (Def.'s Reply to Pl.'s 56.1 Counterstatement at ¶ 65.)  He also told her that he had "deep feelings for" her and that he "knew  exactly what[she] liked, what [she] needed and "how [she] should be stroked."  (Def.'s Reply to Pl.'s 56.1 Counterstatement at ¶ 69.)  He twice asked Ruiz if the feeling was mutual and told her that he wanted her to speak about any feelings she may have had for him.  (Def.'s Reply to Pl.'s 56.1 Counterstatement at ¶ 70.)  During the conversation, Ruiz recalls that Chief Frisina passed nearby and told her that she didn't "know what she was getting herself into."  (Pl.'s Ex. A-1 at 71:9–11.)  Rodriguez also heard part of the conversation and was unconcerned about it.  (Def.'s Reply to Pl.'s 56.1 Counterstatement at ¶ 132.)

The parties dispute, however, the reason for the flagpole incident and the import of Mullin's conduct during it.  Ruiz testified that she was attempting to gain information about Alexis Nieves, another BSBRA volunteer.  (Pl.'s Ex. A-2 at 197:9–11.)  She testified elsewhere that she believed Mullin had sexually assaulted Nieves.  (Pl.'s Ex. A-2 at 113:21–25.)  She added that Nieves was afraid to report the incident and ultimately left BSBRA.  (Pl.'s Ex. A-1 at 17.)  As a crew chief, she felt it her duty to stand up for her crew, of which Nieves was a part.  (Def.'s Resp. to Pl.'s 56.1 Counterstatement at ¶ 78.)  At the time of the discussion, Ruiz testifies she was aware of rumors that Mullin had tried to kiss other female BSBRA members without their consent, and that the membership generally knew of his reputation.  (Pl.'s Ex. A-1 at 54–58.)

Ruiz cannot recall if Mullin admitted or denied being the source of the rumor during this discussion.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 48.)  Mullin testified that he understood that the rumors were a "focal point" of the flagpole discussion even though Ruiz never asked him directly whether he started the rumors, but also testified that he was not aware of these rumors until the flagpole discussion itself.  (Pl.'s Ex. E at 216:12–13, 219:20–24.)  He also testified that he understood that Ruiz was asking about Alexis Nieves.  (*Id*. at 216:22.)  However, Mullin testified that he believed the discussion was an attempt, encouraged by April Kunz, to entrap him into making negative statements about Kunz.  (*Id*. at 56–57.)

Ruiz recalls that at the end of the conversation, Mullin asked for a hug, which she gave only to end the conversation quickly and without incident, out of fear that he would retaliate in some way if she did not.  (Pl.'s Ex. A-1 at 113:11–19); (Pl.'s Ex. C at 188:16–23.)  She may also have told him that his feelings were not one-sided, again only in order to end the conversation quickly.  (Pl.'s Ex. A-2 at 111:2–11.)

6

The day after the flagpole discussion, Ruiz told Mullin that she did not want any further contact with him.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 54.)  She also told him via text that she didn't want to date a BSBRA member because of the possible repercussions of dating a co-worker.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 55.)  Mullin replied saying he was ok with just being friends.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 56.)  However, a further text from Mullin indicated that he may have wanted to discuss these matters further with Ruiz.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 56.)  Mullin thanked Ruiz for reaching out to him, which Ruiz acknowledged in a response, and the two exchanged some further texts, but, thereafter, the two ceased communicating.  (Pl.'s Resp. to Def.'s 56.1 at ¶¶ 57–59.)

During this time, Messing noticed that Ruiz was less happy and spent less time at BSBRA.  (Pl.'s Ex. B-1 (Doc. No. 41-8) at 92:9–15.)  Though the fact is not corroborated by Ruiz's testimony, Messing testified that Ruiz told him that Mullin had touched her and made her feel uncomfortable at the flagpole.  (Pl.'s Ex. B-1 at 85:14–17.)  Messing told her to make a formal written complaint.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 106.)

### D.    Ruiz's Complaint to BSBRA

About a week after the flagpole incident, Ruiz spoke with Kunz.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 61.)  Kunz testified that Ruiz reported a version of events corroborative of Ruiz's, and in conflict with Mullins', that Ruiz told her of Mullin's response, that he found the rumor funny, that he wanted a relationship with Ruiz, and that he wanted to touch her sexually.  (Pl.'s Ex. C at 173:23–25, 174: 2–8.)  Ruiz did not at first want to report the incident because she was afraid of repercussions from Mullin and his friends.  (Def.'s Reply to Pl.'s 56.1 Counterstatement at ¶ 114.)  Ruiz did eventually speak with Board Member Donna Fudge about Mullin's conduct.

(Pl.'s Ex. C at 198:8–9); (Pl.'s Ex. D at 25:2–6.)  At this meeting, Fudge advised Ruiz of her options for making a complaint.  (Pl.'s Ex. D at 25:14–19.)

Details about BSBRA's response can be reconstructed from the testimony of the various parties involved.  Fudge testified that she informed Chief Felix Rodriguez during a board meeting of what she had learned from Ruiz.  (*Id*. at 30:6–12.)  Fudge testified that when she raised Ruiz's complaints, Frisina leveled accusations against her in response.  (*Id*. at 31:4–7.)  Afterwards, Fudge testified that she went to speak with Rodriguez personally.  (31:10–16.)  Rodriguez confirmed in his testimony that Kunz and Fudge explained Ruiz's complaint to Rodriguez and also spoke about other women at BSBRA who "felt the same way."  (Pl.'s Ex. G (Doc. No. 41-15) at 53:14–17.)  Rodriguez testifies that he spoke with Ruiz four days after Fudge brought Ruiz's complaint to his attention.  (Pl.'s Ex. G at 59:16–19.)

After this initial conversation with Rodriguez, Ruiz spoke about Mullin's conduct with Board President Lauri Hughes and Chief Rodriguez.  (Def.'s Reply to Pl.'s 56.1 Counterstatement at ¶ 110.)  At this meeting with Hughes and Rodriguez Ruiz recalls also discussing the alleged sexual assault of Alexis Nieves.  (Pl.'s Ex. A-2 at 132:14–15.)  Ruiz's mother was present at this conversation.  (*Id*.)  At this meeting, Rodriguez told Ruiz and her mother that there was nothing to do.  (Def.'s Reply to Pl.'s 56.1 Counterstatement at ¶ 202.)  Ruiz took this to mean that the Chiefs intended to shield Mullin.  (Def.'s Reply to Pl.'s 56.1 Counterstatement at ¶ 125.)

After the meetings with Kunz, Fudge, Hughes, and Rodriguez, Ruiz met with all of the Chiefs, at her request, in the BSBRA boardroom.  (Def.'s Reply to Pl.'s 56.1 Counterstatement at ¶ 126.)  Prior to this meeting, Ruiz gave the Chiefs the recording she had made of Mullin, though whether the recording was played at the meeting is disputed.  (Def.'s Reply to Pl.'s 56.1

Counterstatement at ¶ 131.)  At this meeting, Frisina told Ruiz to have "thicker skin."  (Def.'s Reply to Pl.'s 56.1 Counterstatement at ¶¶ 128–29.)  Kunz recalls that Beth Haubrich also told Ruiz to have a thicker skin.  (Pl.'s Ex. C at 264:11–18.)

On October 25, 2016, several of the Chiefs spoke to Mullin.  (Pl.'s Resp to Def.'s 56.1 at ¶ 64.)  This meeting can only be reconstructed based on the testimony of the parties involved, and its import and purpose are in some dispute.  Fudge testified, and Rodriguez corroborated, that this communication took the form of a conference between Rodriguez, Frisina, Chapman, and Mullin.  (Pl.'s Ex. D at 39:23–25, 40:2–5); (Pl.s Ex. G at 55:23–25, 56:2–11.)

Ruiz sent Hughes a written statement regarding sexual harassment by Mullin on November 5, 2016, which Hughes acknowledged the same day.  (Pl.'s Ex. N (Doc. No. 41-22.) In this letter, Ruiz said she was not looking to charge or terminate Mullin, but that she did not want him to reach out to or contact her in any way, and that she did not want to be alone with him at all.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 68.)

## E.    BSBRA Reacts to the Complaint

Sometime after he became aware of Ruiz's complaint, Chapman recalls that he offered to take Ruiz to the police precinct if she wanted.  (Pl.'s Ex. F at 87:2–8.)  At around this time, Chapman also asked Mullin to stay away from Ruiz until further notice.  (Def.'s Reply to Pl.'s 56.1 Counterstatement at ¶ 113.)  Fudge believes, however, that the BSBRA defendants never took Ruiz's complaint seriously.  (Pl.'s Ex. D at 67–68.)

In early November, Kunz recalls that Rodriguez demanded a meeting with her about Ruiz's complaint and that she explain the complaint or be terminated.  (Pl.'s Ex. C at 224:6–10.) Kunz remembers telling Rodriguez that Ruiz was scared and upset and that he should take up the complaint with Ruiz personally.  (*Id*. at 12–19.)  She remembers that, after she left the office, she

heard the defendant Chiefs speaking in the boardroom, and that she heard Frisina saying, roughly, "that fucking bitch is causing all these fucking problems because she hates Alex," and "[t]his is just one more time of her causing more fucking problems. This is a bunch of shit." (*Id.* at 59:13–18)

Rodriguez admitted that, apart from questioning Mullin, the Chiefs did not investigate the source of the rumors alleged by Ruiz to have started with Mullin. (Pl.'s Ex. G at 99:21–25, 100:2–6.) Although Rodriguez also reviewed certain surveillance footage of the flagpole conversation, he concluded Ruiz was "lying" and "making it all up." (Def.'s Reply to Pl.'s 56.1 Counterstatement at ¶¶ 199, 206.)

Board Member Laurie Hughes and Rodriguez both told Ruiz that her complaint was unfounded. (Def.'s Reply to Pl.'s 56.1 Counterstatement at ¶ 216.) Even so, BSBRA agreed to set up an agreement between Mullin and Ruiz, which Kunz drafted. (Pl.'s Resp. to Def.'s 56.1 at ¶¶ 72, 73.) The agreement set different riding schedules for the two parties, and different times for each to be in the building. (Pl.'s Resp. to Def.'s 56.1 at ¶¶ 74, 75.) Messing remembers that Ruiz told him about this agreement. (Pl.'s Ex. B-2 (Doc. No. 41-9) at 103:10.) Ruiz felt the agreement was punitive towards her, because it required her to stay away from BSBRA at the time when she would usually do her preferred duty tour. (Def.'s Reply to Pl.'s 56.1 Counterstatement at ¶ 162.)

The Chiefs signed the agreement. (Pl.'s Ex. G at 112:7–14.) Mullin admits that he signed the agreement in the presence of Chief Frisina, and that he understood that it required him to stay out of the facility during designated times. (Pl.'s Ex. E (Doc. No. 41-13) at 244–45.) The agreement in the record shows that it allowed narrow exceptions for communication between

Mullin and Ruiz but did not provide the same exceptions for the schedules laid out.  (Pl.s' Ex. R (Doc. No. 41-26).)

Kunz recalls a harsh reaction against her for her participation in bringing Ruiz's complaint.  She testified that on December 5, 2016, Rodriguez told her to stay away from Ruiz, end their friendship, leave the Friday crew, stay away from its members, and not speak any further about the incident.  (*Id*. at 220:13–25, 221:2–6.)  Kunz also testified that Rodriguez told her and the other Assistant Chiefs, Chapman and Frisina, to stay away from Ruiz because she was a "bad influence" and "causing all sorts of problems.  (*Id*. at 237:8–10.)  Kunz said that in total she was threatened with expulsion more than five times by Rodriguez, Frisina, or Chapman. (*Id*. at 250:14.)  On December 27, 2016, Frisina aggressively heckled Kunz while Kunz was giving a sexual harassment training, questioning and interrupting her repeatedly.  (Pl.'s Ex. Y (Doc. No. 41-33).)

On December 20, 2016, after the agreement had been executed, Ruiz complained that Mullin had been present at a time not permitted by the agreement.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 78.)  Specifically, Ruiz sent an email to Rodriguez on December 20, 2016, complaining that Mullin was not following the agreement.  (Pl.'s Ex. S (Doc. No. 41-27.)  Frisina responded by acknowledging that Mullin had been in the building past the time allowed, but stating that he was responding to a call and was therefore not in violation of the agreement.  (Pl.'s Ex. T (Doc. No. 41-28).)

On December 20, 2016, Ruiz's cousin, Tobar, who also worked at BSBRA, warned Ruiz that Mullin was in the building at a time she was supposed to be present.  (Def.'s Reply to Pl.'s 56.1 Counterstatement at ¶ 180.)  Frisina admitted that he spoke with Tobar immediately

afterwards. (Pl.'s Ex. P (Doc. No. 41-24).)  Ruiz recalls that Tobar left after this incident.  (Pl.s' Ex. A-2 at 106:16–24.)

Fudge saw Mullin in the facility at improper times, "with his feet up," and with the blessing of the Chiefs.  (Def.'s Reply to Pl.'s 56.1 Counterstatement at ¶ 170.)  Ruiz was upset that she was held to the agreement while Mullin was not.  (Def.'s Reply to Pl.'s 56.1 Counterstatement at ¶ 177.)  When she complained, the defendant Chiefs told Ruiz that "she was making a big deal out of nothing."  (Def.'s Reply to Pl.'s 56.1 Counterstatement at ¶ 185.)

On the view of the defendants, Mullin was justified in violating the agreement.  Mullin testified that Frisina permitted the first violation in order to allow Mullin to respond to a call.  (Pl.'s Ex. E at 246:19–25, 247:22–24.)  Chapman testified that Rodriguez also permitted this violation.  (Pl.'s Ex. F at 143:15–19.)  Mullin testified that the decision to allow him to stay was justified at least in part on the basis that the agreement was "petty" compared to the needs of the community.  (Pl.'s Ex. E at 247:11–21.)  Rodriguez testified that he understood that the agreement did not provide for exceptions to the times the two could be present at the facility.  (Pl.'s Ex. G at 116:5–11.)

In April 2017, there was a second incident involving Mullin's presence at a time not permitted by the agreement.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 83.)  In response, Hughes sent a an email reminding the Chiefs of the importance of holding both parties to the contract. (Pl.'s Ex. V (Doc. No. 37-30).)  On Fudge's view, the agreement was not enforced.  (Pl.'s Ex. D at 146:12–18.)

Ruiz experienced bullying and name-calling as a result of complaining, including being called a "freak show" by members of the Saturday crew. (Pl.'s Ex. A-2 at 133:23–25, 134:2–4.)  Kunz recalls that she heard other members speaking ill of Ruiz and her complaint, and that

Rodriguez told Ruiz at one point to "grow up."  (Pl.'s Ex. C at 235:25, 236:2–3, 264:20–22.)  Kunz recalls that Ruiz complained to her about the bullying she was experiencing upwards of ten times.  (*Id*. at 248:12.)  Ruiz recalls that members of her crew were retaliated against, with Messing kicked out and two other members, Mary Dolan and Danny Bonge, suspended.  (Pl.'s Ex. A-2 at 133–35.)  Ruiz added that Frisina told her to "keep her mouth shut" and generally made her feel intimidated.  (*Id*.); (Pl.'s Ex. A-3 at 20.)

Fudge testified that Frisina wrote a letter questioning her integrity in response to her involvement in Ruiz's complaint.  (Pl.'s Ex. D at 85:10–16.)  Fudge later wrote a letter accusing Frisina of retaliation, after Frisina accused her of "collusion to undermine him."  (Pl.'s Ex. EE (Doc. No.  41-39).)  The record shows that Fudge ultimately resigned in response to the treatment she received.  (Pl.'s Ex. DD (Doc. No. 41-38).)

The actions of the Defendant Chiefs made Ruiz feel scared and intimidated.   (Pl.'s Ex. A-1 at 46:22–25, 47:2–8.)  She eventually ceased volunteering, after which, in January 2018, BSBRA informed her it was holding a hearing on whether she should be expelled for failing to make her volunteer hours.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 99–100.)  Ruiz did not attend the hearing.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 101.)  She said that she stayed away because Mullin, who was now a chief, would be present, and that she wanted to avoid him.  (Pl.'s Ex. A-3 at 284:17–24.)

### F.     The BSBRA Installation Dinner and Termination of John Messing

Every year, BSBRA held an installation dinner to celebrate the appointment of new officers.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 115.)  In 2016, Messing went to the installation dinner alone.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 114.)  Ruiz did not attend.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 116.)

13

At the dinner, Messing, who believed that Ruiz had stayed away out of fear and discomfort, (Pl.'s Ex. B-2 at 125:3–6), complained to chiefs Frisina and Chapman that Ruiz was being sexually harassed.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 117.)  The record pertaining to the events of this evening is based on Kunz's testimony.  Kunz testified that both sides were confrontational and at times loud during this discussion, which eventually moved outside of the dinner.  (Pl.'s Ex. C at 300–03.)  She added that Messing was upset and, at times, crying.  (Pl.'s Ex. C at 295:13–18.)  She added that, at one point, she had to intervene to de-escalate the situation, after Rodriguez and others formed a tight circle around Messing.  (Pl.'s Ex. C at 302:11–16.)  Messing testified that he told the chief that he was disappointed in their failure to take action, and that he would file a sexual harassment claim with the state.  (Pl.'s Ex. B-2 at 101:11–16.)

The parties dispute Messing's motivations and conduct at the installation dinner. Rodriguez testified that Messing was drunk, and that Chapman told him that he had been touching women inappropriately.  (Pl.'s Ex. G at 181:10–13.)  Messing was suspended on the spot and asked to leave the dinner.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 127.)  Messing conceded that he had been drinking that night, and agreed the dinner was not an appropriate place for this complaint.  (Pl.'s Resp. to Def.'s 56.1 at ¶¶ 133–34.)  At a later hearing held by the Chiefs, Messing was told that he was being accused of misconduct at the installation dinner, and that the hearing did not have to do with Ruiz.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 140.)  Messing's membership was formally terminated as a result of the meeting.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 142.)

14

## II.        Right-to-Sue Letter

The plaintiffs filed their charges with the Equal Employment Opportunities Commission ("EEOC").  (Compl. at ¶ 21.)  Plaintiffs received a Notice of Right to Sue on dated October 31, 2017 on November 3, 2017.  (Compl. at ¶ 22); (EEOC Notice (Doc. No. 1-1).)  The action was commenced within the required 90 days from receipt of the notice.

## III.    Plaintiff's Claims

On January 16, 2018, Ruiz and Messing filed a complaint against BSBRA and the Defendant Chiefs.  (Compl. (Doc. No. 1).)  In her first cause of action, Ruiz alleged sexual harassment and hostile work environment against Mullin for the flagpole incident and related actions.  (Compl. at ¶¶ 192–96.)  She also alleged that BSBRA, Rodriguez, Frisina, and Chapman (the "Chief Defendants") blamed Ruiz for Mullin's conduct, and pursued a course that victimized and humiliated Ruiz.  (Id. at ¶¶ 197–201.)  In a second cause of action, Ruiz and Messing alleged that BSBRA and the Chief Defendants retaliated against them for complaining of sexual harassment.  (Id. at ¶¶ 204–18.)  In a third cause of action, repeating the facts set forth in the first cause of action for Title VII sexual harassment, Ruiz alleged discrimination under the New York State Executive Law.  (Id. at ¶¶ 219–29.)  In a fourth cause of action, repeating the facts set forth in the second cause of action for Title VII retaliation, Ruiz alleged retaliation under the New York State Executive Law.  (Id. at ¶¶ 230–42.)  In a fifth cause of action, Ruiz alleged that Rodriguez, Frisina, Chapman, and Mullin aided and abetted discrimination under the New York Executive Law.  (Id. at ¶¶ 243–53.)

15

IV.     **The Instant Motion**

The parties submitted a fully briefed motion for summary judgment, response in opposition and reply on October 24, 2019.  (Doc. Nos. 40–42.)  In their motion for summary judgment, defendants raise four points.

First, they argue that Ruiz failed to establish the "severe and pervasive" element of a hostile work environment claim.  (Mot. for Summ. J. at 12.)  They characterize the purported misconduct as minor, far below the threshold for a showing of sexual harassment.  (*Id*. at 20–21.)

Defendants argue that the flagpole discussion was not severe, since Mullin only stated his amorous interest to Ruiz.  (*Id*. at 14–15.)  Nor, they posit, does anything about the flagpole discussion make the purported harassment pervasive, since Ruiz admits that, before it, Mullin never "crossed the line," always respected Ruiz's decision not to date him, and ceased communications with her at her request.  (*Id*. at 15.)  As a discrete episode, defendants conclude, the flagpole incident cannot possibly qualify as "pervasive."  (*Id*.)

Defendants also argue that the rumor spread about Ruiz cannot support her claim as a matter of law.  (*Id*. at 17.)  The rumor, they insist, was not based on Ruiz's sex, but on ill will arising from the contested election between Mullin and Kunz.  (*Id*. at 18.)  Moreover, they take the position that the rumor is inadmissible hearsay. (*Id.* at 18–19.)

Moreover, defendants argue that the conduct Ruiz claims was harassing was in fact welcomed by her.  They urge that the sexually explicit texts sent by Ruiz suggest that Mullin's amorous advances during the flagpole discussion were not unwelcome.  (*Id*. at 14–15.)

Second, defendants argue there is no genuine dispute of material fact as to Ruiz's claim of retaliation.  They argue that BSBRA did not retaliate against Ruiz, because BSBRA leadership remediated the situation by ensuring that Ruiz and Mullin would not communicate or work the

16

same shift,  (*Id*. at 22.), nor is there evidence of hostile workplace retaliation,  (*Id*. at 23.)
Moreover, they argue that Ruiz cannot prove causation, because, as she admits, the bullying and
name-calling by colleagues which she claims amounted to retaliation stemmed from the election,
rather than her complaints.  (*Id*. at 23–24.)  The same, defendants continue, is true of Mullin's
breach of the no-contact agreement, which defendants argue he violated due to the operational
needs of BRSBA, and not in retaliation for Ruiz's complaint.  (*Id*. at 24.)  As for Messing's
claim of retaliation, defendants argue that he did not engage in protected activity, because he did
not make a good-faith complaint of sexual harassment.  (*Id*. at 24–25.)  Nor, defendants argue,
can he prove that any protected action caused the purported retaliation, because the termination
stemmed solely from Messing's behavior at the BSBRA dinner.  (*Id*. at 26.)

Third, defendants argue that the claims against Mullin, Chapman, Rodriguez, and Frisina
must be dismissed because individuals are not subject to liability under Title VII, nor have they
incurred liability as "aiders and abettors" under NYSHRL because they did not actively
participate in any discriminatory conduct.  (*Id*. at 26–27.)  Finally, punitive damages are not
warranted, on defendants' view, because the purported conduct was not "willful and egregious,"
and because BSBRA is shielded by sovereign immunity.  (*Id*. at 27.)

Ruiz counters defendants' first argument, against her claim of sexual harassment, that the
evidence as to defendants' alleged discriminatory conduct creates a genuine fact issue as to
severity and pervasiveness.  (Opp'n at 8.)   She argues that the evidence does in fact demonstrate
severe conduct on the part of Mullin.  (*Id*. at 9.)  Ruiz argues more generally that the record
demonstrates a course of tolerating, permitting, and even encouraging a hostile workplace on the
part of BSBRA leadership.  Because the Defendant Chiefs and BSBRA board members
continuously condoned and supported Mullin's behavior, the workplace was hostile under the

totality of circumstances.  (*Id*. at 12.)  She further argues that the conduct of BSBRA's

volunteers in spreading rumors and bullying Ruiz should be imputed to BSBRA through the

conduct of the defendant Chiefs.  (*Id*. at 15.)  The Chiefs, Ruiz argues, were aware of the

bullying and never addressed it.

      Ruiz counters defendants' contention that Ruiz welcomed the allegedly discriminatory

conduct.  First, she rebuts that it is not a defense that Mullin and Ruiz were friends at one point.

(*Id*. at 13.)  Nor, she counters, have defendants conclusively proved that there are no facts tying

the sexual rumors to Mullin.  (*Id*.)  Ruiz argues that, from this record, a juror could conclude that

Mullin spread these rumors, contributing to a hostile work environment.  (*Id*. at 14–15.)  These

rumors were not "sex neutral," contrary to defendants' claim.  (*Id*.)  Nor, on Ruiz's view, can

defendant disqualify evidence of the rumors as hearsay, because they are not being offered for

their truth but for the fact that they were said and that BSBRA was negligent in investigating

their source.  (*Id*. at 17.)

      As for defendants' second argument, against her retaliation claim, Ruiz urges that the

verbal abuse Ruiz experienced was more than "petty" and should be considered retaliation.  (*Id*.

at 21–24.)  Ruiz also argues that it was also retaliatory of the Chiefs to permit Mullin to flout the

terms of the agreement between him and Ruiz, while Ruiz adhered to it in spite of the burdens it

placed on her.  (*Id*. at 22.)  Further, Ruiz argues that BSBRA's retaliation against the volunteers

who supported Ruiz's complaint created a retaliatory environment.  (*Id*. at 23.)  Ruiz argues that

she can prove that the retaliatory conduct was related to her complaints about gender

discrimination, rather than the election.  (*Id*. at 24.)

      As for the retaliation against Messing, Messing disputes defendants' arguments that

BSBRA fired Messing merely for his conduct at the ceremony.  (*Id*. at 24–27.)  Messing argues

that he complained in good faith, pursuant to his belief that Ruiz was being sexually harassed, and out of a feeling of deep frustration with BSBRA's response.  (*Id.* at 26–27.)  On Messing's view of the record, his conduct at the installation dinner was a mere pretext for firing.  (*Id.* at 27.)

Finally, plaintiffs argue that defendants may be held liable as aiders and abettors under NYSHRL because they participated in the events giving rise to the discrimination, and that BSBRA is not a municipal entity cloaked in sovereign immunity.  (*Id.* at 30–31.)

## DISCUSSION

## I.    Standard of Review

Summary judgment is appropriate when the pleadings, depositions, interrogatories, and affidavits demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is "material" if it may impact the "outcome of the suit under the governing law."  *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed," and the Court must draw all "justifiable" or reasonable inferences in favor of the non-moving party.  *Anderson*, 477 U.S. at 255 (citation omitted); *see also Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995) ("[T]he court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions ... in the light most favorable to the party opposing the motion." (citations omitted)).  In ruling on a summary judgment motion, the Court may rely on any material that would be

19

admissible at a trial.  *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 57 (2d Cir. 2012) (quotations and citations omitted).

Once the moving party has demonstrated that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, "the nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted) (citation omitted); *see also Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (collecting cases and stating that the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation").  In other words, the non-movant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor."  *Anderson*, 477 U.S. at 256.

## II.     Sexual Harassment

### A.     Hostile Work Environment Claim

#### 1.     The Elements of the Claim

Title VII of the Civil Rights Act of 1964 bars employers from discriminating based on sex in the terms, conditions, or privileges of employment.  42 U.S.C. § 2000e-2(a)(1).  "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated."  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted).  In order to prevail on a hostile environment claim under Title VII, a plaintiff must establish two elements.  First, the plaintiff must prove that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (citations and internal quotations omitted).  Second, the

plaintiff must show that the hostile work environment can be imputed to the employer.  *See Karibian v. Columbia Univ.*, 14 F.3d 773, 779 (2d Cir. 1994).[2]  The gravamen of any sexual harassment claim is that the alleged sexual advances were "unwelcome."  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986).

Defendants argue that Ruiz has not adduced evidence from which a juror could infer a hostile work environment because the record does not support a finding that any discriminatory behavior was "severe or pervasive."  "[S]urviving summary judgment on a hostile environment claim under section 1983 (as under Title VII) requires evidence not only that the victim subjectively perceived the environment to be hostile or abusive, but also that the environment was objectively hostile and abusive, that is, that it was permeated with discriminatory intimidation, ridicule, and insult, . . . that is sufficiently severe or pervasive to alter the conditions of [employment]."  *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003) (internal quotations and citations omitted).

However, here, defendants are not challenging Ruiz's subjective perception of her environment.  They argue only that the environment was not objectively hostile and abusive. There are two routes to satisfying the objective prong of the prima facie case for a hostile work environment claim.  The plaintiff "must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment."  *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks omitted).  The alleged harassment must be based on the plaintiff's gender or connected to her gender by circumstantial or other evidence.  *See Pucino v. Verizon Commc'ns, Inc.*, 618 F.3d 112, 117 (2d Cir. 2010).

---

[2] Defendants have not sought summary judgment on this point, and it does not appear to be in contention.  The Court will consider only the issue urged by defendant, that the workplace in question was not objectively hostile.

"[I]solated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998) (touching breasts with a piece of paper, and telling employee she had been voted "sleekest ass" in the office, too discrete and isolated to constitute a hostile work environment); *e.g., Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102–03 (2d Cir. 2010) (genuine fact issue, where record showed six documented sexual comments, grabbing plaintiff and other women around the waist, tickling, staring, over a period of seven months); *cf Macshane v. City of New York*, No. 05-CV-06021 (RRM) (RML), 2015 WL 1298423, at *25 (E.D.N.Y. Mar. 23, 2015) (five instances of offensive behavior insufficient to defeat summary judgment). However, a single incident, if sufficiently humiliating or outrageous, could by itself satisfy the "severe" prong. *See Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (co-worker's loud, public claim that the plaintiff, a fire department lieutenant, had performed fellatio for her promotion was *per se* severe); *cf. Montgomery v. Chertoff*, No. 03-CV-5387 (ENV) (JMA), 2007 WL 1233551, at *16 (E.D.N.Y. Apr. 25, 2007) (a rumor that an employee had slept with a co-worker not *per se* severe).

In its analysis, the Court must consider the totality of circumstances. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). In doing so, the Court may consider not only the frequency and severity of the conduct, but whether the conduct is physically threatening or humiliating as opposed to merely offensive, and whether the conduct complained of unreasonably interferes with the plaintiff's job performance. *See Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014). This analysis encompasses the workplace as a whole. Thus, even where a witness is not the complainant, their testimony may be relevant to the inquiry into

22

whether a workplace is objectively hostile, regardless of whether the complainant also experienced or witnessed the precise abuse which the witness describes.  *See Perry,* 115 F.3d at 151; *see also Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir.1997) ("a racial [or sexual] epithet need not be directed at a plaintiff in order to contribute to a hostile environment").  Of course, the usual rules of hearsay apply, and an out-of-court statement offered for its truth is not admissible unless an exception applies.  *See* Fed. R. Evid. 801(c)(1); *e.g.,* 801(d)(2) (a statement of the opposing party offered against the opposing party is not hearsay).

### 2        The Events in Evidence

The Court takes no position on defendant's contention that no single event in the record was severe enough, standing alone, to create an objectively hostile work environment.  In aggregate, the events in the record were sufficiently regular, in light of their relatively humiliating and intimidating nature, that a jury could find that the workplace was hostile.

The Court finds that Ruiz has adduced admissible evidence of seven relevant events. These events, which occurred over a period spanning 2015 to 2017, were: (1) and (2) two incidents where Mullin accosted women at BSBRA parties; (3) the gingerbread house; (4) the rumors that Ruiz was sleeping with BSBRA volunteers in exchange for votes; (5) Mullin's sexual advance at the flagpole; (6) and (7) two incidents when the Defendant Chiefs permitted Mullin to flout his agreement with Ruiz.  The Court will examine each in turn, analyzing all relevant circumstances and especially with an eye towards conduct that is "physically threatening or humiliating as opposed to merely offensive" or that "unreasonably interferes with the plaintiff's job performance."

First, in her testimony, Kunz offered admissible evidence that Mullin once grabbed and kissed BSBRA member April Johnson in front of Johnson's fiancé, at some point in 2015 or

before.  Ruiz was aware of this incident.  In either 2014 or 2015, Kunz saw Mullin chase and

grind his body on a non-member guest at a BSBRA party without the guest's consent.  These

events speak to a highly humiliating and threatening environment of work at BSBRA.

Third, the gingerbread house was raunchy and lewd – disrespectful rather than

threatening or humiliating.  Nor is there any evidence that it interfered with Ruiz's work.  It is

nonetheless probative of the environment at BSBRA, if not as probative as the two events

described above.

Fourth, while a juror could find that the rumors were humiliating, and while there is some

evidence that they did interfere with Ruiz's work performance, they were not so humiliating or

outrageous as to rise to the level of *per se* severity  Nonetheless, they are highly probative of the

totality of circumstances at BSBRA, given their potential to seriously damage or derail Ruiz's

career.  Defendants counter that the rumors are not admissible at all, because they are hearsay.

While there is no non-hearsay evidence tying the rumors to Mullin, they are not offered for their

truth (which in this case would be that Ruiz did in fact sleep with BSBRA members in exchange

for votes), but instead to demonstrate the work environment at BSBRA.

When Ruiz confronted Mullin about the rumors, he acted dismissively, and he chose an

inappropriate time to then express his feelings for Ruiz, but his behavior, too, cannot be

described as severe.  Nowhere does the record show that he or anyone else touched Ruiz sexually

or caused her to feel threatened.[3]  Nevertheless, a juror could find his actions disrespectful and

likely to interfere with Ruiz's work.

---

[3] Kunz and Mullin both testified that Ruiz told them that Mullin had touched her.  However, both instances would be hearsay if offered to prove that Mullin did in fact touch Ruiz.  Ruiz did not so testify.

Finally, on two occasions, in December of 2016, and in April of 2017, the Chiefs allowed Mullin to violate his agreement with Ruiz, in a way that put Ruiz into fear of coming into contact with him.  These events caused Ruiz to feel intimidated and unsafe in the workplace.

> **3.     The Events in Aggregate Could Lead a Juror to Conclude that Harassment was a Regular Occurrence at BSBRA, and therefore that Hostility was Pervasive**

Considering these events in aggregate, with all inferences drawn in favor of Ruiz, a juror could find that she experienced an objectively hostile work environment.

Ruiz was aware that Mullin had physically accosted another employee of BSBRA in the past.  She had also seen the gingerbread house the year before.  Towards the end of 2016, a rumor circulated about her, that she was performing sexual favors to advance the career of another woman.  A juror could conclude that the rumor was current for as long as a month.  The rumor was much more damaging than the sort of rumor of promiscuity at play in *Chertoff*, if less damaging than the one in *Howley*.  It had the potential to seriously damage Ruiz's career, and it did seriously impact her morale.  Subsequently, in a conversation with Mullin, Mullin expressed desire for Ruiz, including saying he knew "how to stroke her,"[4] causing Ruiz to complain to leadership.  The leadership of BSBRA implemented the resulting settlement between Ruiz and Mullin in a way that a juror could find was calculated to further intimidate Ruiz, because they allowed Mullin to flout the agreement without notice to Ruiz, who was following its terms meticulously in order to avoid Mullin.  The first episode in which Mullin flouted the agreement occurred shortly after the flagpole conversation, in December, 2016.  The next did not occur for several months, in April, 2017, but, by this time, *see infra,* Section II.A., the chiefs were already

---

[4] As an opposing party statement, this statement of Mullin's, as reported by Ruiz in her deposition, is not hearsay under the Federal Rules of Evidence.

retaliating against Ruiz for her complaint.[5]  Under the totality of circumstances, a juror could

infer that Ruiz expected abusive treatment at any time, even if several months intervened

between these two episodes.  That is especially so given the relative severity of the rumors, the

intimidating nature of Mullin's conduct, and the background of abuses at BSBRA as understood

by Ruiz.

The relative severity of the rumors and intimidating nature of Mullin's conduct lessens

the need to show the kind of continuity that might be needed in a claim based purely on offensive

speech.  The Second Circuit requires a showing of "concert" or "regularity."  Events may be

regular even if spaced out in time, so long as they are frequent in proportion to their severity and

expected by victims, because one humiliating or intimidating event may render a workplace

more abusive than even dozens of minor events or insults.  The question that must guide the

inquiry into pervasiveness is whether the events, under the totality of circumstances, changed the

conditions of the plaintiff's employment on account of gender.  The events in evidence occurred

over the course of about 2 years.  Taking all inferences in Ruiz's favor, a juror could find that

humiliating and intimidating behaviors occurred with enough "regularity" over this time period

as to put women volunteers at BSBRA in constant fear of abusive treatment, resulting in a

change to their working conditions on account of gender.

To the gingerbread house and the flagpole discussion with Mullin, defendants counter

that these events were "welcome" because Ruiz engaged in raunchy text exchanges with co-

workers in 2015 and 2016.  Defendants argue that this evidence should therefore not be weighed

in the analysis.  The Court is not aware of any precedent adopting defendants' theory of

---

[5] A juror could find the Chiefs' permissiveness towards Mullin's flouting the agreement was gender based on circumstantial evidence, since Kunz heard Chief Frisina calling Ruiz a "fucking bitch" after the time she made her complaint.

"constructive welcome-ness," whereby an employee constructively welcomes all offensive

behavior because she welcomes some arguably offensive behavior.  While the text exchanges are

probative of the environment at BSBRA, the import of these text exchanges is a question for the

factfinder, especially given that Ruiz testified that she would have asked for the house to be

removed had she not been a probationary volunteer, and given the evidence of Mullin's

unwanted sexual advance at the flagpole.[6]

### B.     The NYSHRL claims

"In the determination of whether sexual harassment has occurred, claims brought under

Title VII and the NYSHRL can be evaluated identically."  *Perks v. Town of Huntington*, 251 F.

Supp. 2d 1143, 1158 (E.D.N.Y. 2003).[7]  Therefore, for the same reasons stated above, the Court

denies summary judgment on Ruiz's claims under NYSHRL.

## II.     Retaliation

### A.     Ruiz

To establish a prima facie case of retaliation under Title VII, an employee must show

that: (1) he or she was engaged in protected activity; (2) the employer was aware of that activity;

(3) the employee suffered a materially adverse action; and (4) there was a causal connection

between the protected activity and that adverse action.  *Lore v. City of Syracuse*, 670 F.3d 127,

157 (2d Cir. 2012).  In determining whether a plaintiff has satisfied this burden, the court's role

is "to determine only whether proffered admissible evidence would be sufficient to permit a

---

[6] The texts themselves were welcome.  (Pl.'s Resp. to Def.'s 56.1 Statement at ¶¶ 15, 27.)

[7] In 2019, New York State eliminated the "severe or pervasive" standard. 2019 Sess. Law News of N.Y. Ch. 160 (A. 8421), § 296(h) (McKinney).  Defendants contend that this law was not yet in effect at the time of the filing of the complaint, and therefore does not apply here.  Under New York State law, unless it clearly states otherwise, a statute will be presumed to have only prospective application.  *Majewski v. Broadalbin-Perth Cent. Sch. Dist.*, 91 N.Y.2d 577, 589 (1998).  Since nothing in this statute indicates a legislative intent that it should apply retroactively, the Court will apply the old rule of assessing NYSHRL and Title VII harassment in the same way.

rational finder of fact to infer a retaliatory motive." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). Defendants challenge prong (3) and prong (4) of Ruiz's prima facie case. As to (3), the parties dispute whether BSBRA took a materially adverse action against Ruiz. As to (4), defendants argue that Ruiz has not alleged facts from which a factfinder could infer that any such adverse action was motivated by retaliatory animus.

### 1.    Adverse Employment Action

An adverse employment action is one which is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). A use of managerial power to remove or reduce privileges, such as reducing pay or terminating an employee, is of course the *sine qua non* of retaliation. *See, e.g., Dillon v. Ned Mgmt.*, 85 F. Supp. 3d 639, 664 (E.D.N.Y. 2015) (finding that the docking of plaintiff's pay and her subsequent termination can each be considered adverse employment actions). However, it is no longer the law that the employer must change the terms or conditions of an employee's employment in order for the action to be considered adverse. *See Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010). The question instead is whether the employer's actions were "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id*. (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). The actions of employers must be considered both separately and in aggregate. *Hicks v. Baines*, 593 F.3d at 165. As the Supreme Court has held, context matters to the inquiry. For instance, "[a] schedule change in an employee's work schedule may make little difference to many workers, but matter enormously to a young mother with school-age children." *Burlington N*., 548 U.S. at 69; *see Hicks v. Baines*, 593 F.3d at 165 (a scheduling change was materially adverse when it forced plaintiff, a social-worker, to work with

more dangerous subjects); *Pacheco v. New York Presbyterian Hosp.,* 593 F. Supp. 2d 599, 619 (S.D.N.Y. 2009) (finding not adverse two shifts in plaintiff's work-day, from 8:00 a.m./4:00 p.m. to 8:30 a.m./4:30 p.m., then to 9:30 a.m./5:30 p.m, absent evidence of any impact on plaintiff's personal life).

Because Title VII was not meant to enforce a general code of civility, petty slights and minor annoyances do not count as adverse actions. *See Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) (citations omitted). However, the Supreme Court has made clear that social pressures may be material if circumstances suggest that they cause real harm in the context of a particular workplace. For instance,

> [a] supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.

*Burlington N.,* 548 U.S. at 69; *cf. Carvalho v. Associated Brands, Inc*., No. 15-CV-72 (RJA) (MJR), 2016 WL 8709809, at *10 (W.D.N.Y. May 13, 2016), *report and recommendation adopted,* No. 1:15-CV-00072 (MAT), 2017 WL 405403 (W.D.N.Y. Jan. 31, 2017), *aff'd,* 707 F. App'x 742 (2d Cir. 2017) (dirty looks and bad vibes by co-workers and supervisors not actionable harms); *Dickens v. Hudson Sheraton Corp. LLC*, 689 F. App'x 670, 673 (2d Cir. 2017) (a co-worker's verbal outburst at a team meeting did not constitute a materially adverse action).

Here, there is sufficient evidence from which a juror could conclude that Ruiz suffered an adverse employment action, because a reasonable employee in her position would have been discouraged from complaining. As part of the settlement with Mullin, Ruiz was assigned a riding schedule that she found burdensome and punitive because it deprived her of her preferred

riding day.  A juror could infer that the Defendant Chiefs were aware of Ruiz's preferred schedule and acted accordingly to deny her preference.  While denying an employee their preferred schedule might not by itself amount to material adversity at a paying job where employees must tolerate some schedule changes, as in *Pacheco*, it must be borne in mind that BSBRA was a volunteer organization.  Pushing Ruiz into an unwanted schedule would have profoundly altered the voluntary character of the job for her.

The schedule change should not be viewed in isolation but must be considered in aggregate with the Chiefs' preferential treatment of Mullin and intimidating behavior towards Ruiz.  The record shows that Mullin violated this agreement twice, potentially with the acquiescence of the Chiefs, and that Ruiz ultimately felt that she would be unable to avoid Mullin at BSBRA.  The evidence also shows that leadership may have attempted to intimidate her, with Chief Rodriguez telling her to "grow up," and Chief Frisina telling her to keep her mouth shut.  Thus, the Chiefs did not merely fail to implement the agreement by accident or negligence, they appeared to act in knowing bad faith when they signed it.  Defendants argue that the agreement cannot be probative of retaliation, because it was drafted at Ruiz's request and satisfied her demands.  However, because of the conflicted record, whether BSBRA respected this agreement, and whether it may have been implemented in a retaliatory fashion, are both questions for the jury.

Moreover, Ruiz testified that BSBRA leadership retaliated against friends and associates of Ruiz, in a way that a juror could find was calculated to pressure Ruiz.  There is evidence that Mary Dolan and Danny Bonge were suspended for associating with Ruiz.  It is not totally clear from the record when these suspensions occurred, but a juror could infer that Ruiz was aware of both suspensions sometime in 2017.  In addition, the chiefs may have pressured Kunz, Fudge and

several of Ruiz's colleagues, including her cousin, to avoid Ruiz. The record shows that Frisina

spoke to Ruiz's cousin in December 2016 after he attempted to warn her of Mullin's presence at

BSBRA, and may have attempted to intimidate him. It also shows that he heckled Kunz while

she was giving a sexual harassment training later that December 2016. Rodriguez publicly

attacked Fudge for her support of Ruiz, so severely that she may have been pushed to leave

BSBRA as an active member. In an environment dependent upon teamwork, such as an

ambulance corps, the Defendant Chiefs' actions to isolate Ruiz and poison colleagues against her

may have been especially damaging. The facts must also be read in light of a workplace where

promotion depended upon winning membership elections. Ruiz was a crew chief at the time of

the events in the complaint, with some apparent potential to rise through the ranks. It is possible

that, if the Defendant Chiefs succeeded in making Ruiz a social pariah, they would succeed in

ruining her future at BSBRA, by making it impossible for her to win such elections in the future.

This is exactly the sort of career interference that the Supreme Court described in *Burlington*

*Northern*, as opposed to the social slights described in *Carvalho* and *Dickens*.

Considering BSBRA's actions in the aggregate, a juror could conclude that, between

changing Ruiz's schedule, allowing Mullin to flout his agreement with Ruiz, and deliberately

pressuring and suspending Ruiz's friends and acquaintances, BSBRA acted in a way that would

deter a reasonable employee from complaining.

In addition, Fudge testified that she regretted supporting Ruiz, would not have done so

again, and that she eventually resigned her position. Since the objective test asks whether a

reasonable person under the circumstances would have been deterred from complaining, a juror

might find it compelling that a person in a position closely parallel to that of Ruiz (indeed,

complaining of the same conduct) testified that she regretted supporting Ruiz's complaint and would not have done so again.

It is true, as defendants argue, that the Supreme Court has cautioned against treating personality conflicts or snubbing as actionable harms.  Defendants thus make much of the bullying Ruiz suffered, arguing that mere bullying does not suffice to carry Ruiz's retaliation claim past summary judgment.  Ruiz's claim, however, goes beyond mere bullying.  As discussed, the record encompasses evidence of a concerted attempt on the part of management to isolate Ruiz.  A juror could find that there was more than mere snubbing here.

## 2.    Causation

Ruiz has also adduced sufficient evidence to survive summary judgment on the issue of causation.  A plaintiff may show causation: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."  *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *accord Drouillard v. Sprint/United Mgmt. Co.*, 375 F. Supp. 3d 245, 273 (E.D.N.Y. 2019) (applying the standard on summary judgment).

There is more than enough evidence from which a juror could conclude that Ruiz's complaint caused the retaliatory actions of the Chiefs.  First, their actions began to unfold in the immediate aftermath of Ruiz's complaint.  Second, the record shows that the chiefs may have targeted Ruiz out of animus against her in reaction to her complaint.  The chiefs made hostile remarks towards Ruiz and allegedly hounded many of her friends and colleagues who supported

her.  Kunz testified that she heard Chief Rodriguez calling Ruiz a "liar" and a "bitch" in the aftermath of the complaint.

There is also evidence of disparate treatment to a similarly situated employee.  Mullin testified that he complained that Ruiz was harassing him.  The record shows that the agreement at issue in this case was drafted *both* to protect him and to protect Ruiz.  His complaint would have been concurrent with Ruiz's complaint.  Unlike Ruiz, there is evidence that the Chief defendants worked to shield Mullin from harm and continued to treat him in a friendly manner. From these facts, a juror could easily infer causation.

Finally, Defendants argue that any alleged retaliation stemmed not from Ruiz's complaint but from the election, and that Mullin breached his agreement for the legitimate operational needs of BSBRA.  Simply put, the record is conflicted on these points.  It is for the factfinder to determine whether to credit BSBRA's reasons for the alleged retaliatory acts, as well as to determine the reasons for Mullin's breach of the agreement.

### B.    Messing

#### 1.    Good Faith Belief in a Violation of Title VII

Defendants argue that Messing has not adduced evidence that he had a good faith and reasonable belief that a violation of Title VII had taken place.  In other words, they attack the first element of Messing's prima facie case.  The Court agrees that the evidence could not lead a reasonable juror to find that Messing complained in good faith of a hostile work environment.

An employee's complaint may qualify as protected activity, satisfying the first element required to establish a prima facie case of retaliation, if the plaintiff has a good faith, reasonable belief that he was opposing an employment practice made unlawful by Title VII.  *Kelly v. Howard I. Shapiro & Associates Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d Cir.

2013).   The reasonableness of plaintiff's belief is to be assessed in light of the totality of the

circumstances.  *Id.* at 14–15.  Even if the conduct complained of was not in fact unlawful,

plaintiff may prevail on a claim of retaliation if the belief was objectively reasonable.  *Id.* at

16.  In the case of a hostile workplace claim, the Court should examine whether the complainant

was reasonably aware of the elements of such a claim, i.e. behavior amounting to an environment

of "severe or pervasive" insult or ridicule.  *See Rivera v. New York City Dep't of Correction*, 951

F. Supp. 2d 391, 399 (E.D.N.Y. 2013); *Irons v. Bedford-Stuyvesant Cmty. Legal Servs.*, No. 13-

CV-4467 (MKB), 2015 WL 5692860, at *19 (E.D.N.Y. Sept. 28, 2015).

In this case, a jury could not conclude that Messing reasonably and in good faith believed

that Ruiz was the victim of a hostile work environment.  Ruiz described to Messing the flagpole

incident, which Messing could have believed involved an unwanted sexual advance.  Messing

testified that Ruiz told him that Messing had touched her in a way that made her uncomfortable

at this meeting.[8]  Messing noticed that Ruiz was unhappy and came to the BSBRA station less

frequently.  In addition, Messing was informed that Ruiz did not attend BSBRA's annual dinner

because she was uncomfortable and did not want to be near Defendant Mullin and the Defendant

Chiefs.  Messing was therefore apprised of some elements probative of a hostile workplace

claim.

However, even based on the evidence before him, Messing could not have concluded that

Ruiz was being subjected to a severely or pervasively hostile work environment.  According to

the record, Messing knew only of one incident, which he believed involved some touching that

made Ruiz "uncomfortable," and of an unwanted sexual advance.  He was aware, therefore, of

only a part of Ruiz's sexual harassment claim, a part which, as already discussed, was not by

---

[8] While this testimony was hearsay for determining whether Mullin did in fact touch Ruiz, it is not hearsay for purposes of determining Messing's belief at the time he complained.

itself severe.  His belief that Mullin had touched Ruiz does not change matters, as nothing suggests he believed that the touch was humiliating or threatening.  He could not, therefore, have had a good faith belief that a violation of Title VII had taken place.

Because Messing has not alleged that he reasonably and in good faith complained of a hostile work environment, it is not necessary to consider defendant's two further contentions, (1) that he could not have complained in good faith because he was drunk, and (2) that he was terminated for his drunkenness at the BSBRA installation dinner rather than for his complaint.

### C.    NYSHRL Retaliation

Traditionally, "[t]he standards for evaluating . . . retaliation claims are identical under Title VII and the NYSHRL."  *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir.2013).  Both statutory provisions prohibit an employer from discriminating or retaliating against an individual "because" he or she engaged in protected activity.

However, now "it is unclear whether the Supreme Court decision in *Nassar*, which changed the standard for establishing causation in a retaliation claim from showing that retaliation was a 'motivating factor,' to showing that it is a 'but-for' cause of the adverse employment action, applies to retaliation claims brought pursuant to the NYSHRL."  *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 221 (E.D.N.Y. 2014).   Although "New York State Courts have yet to address the impact of the Supreme Court's recent holding in *Nassar* on the NYSHRL, nor has the Second Circuit provided . . . guidance as to this issue," this Court will follow the approach of other courts in the district and continue to construe the NYSHRL as requiring the same elements as Title VII.  *See Leacock v. Nassau Health Care Corp., No.* 08-CV-2401 (DRH) (GRB), 2013 WL 4899723, at *9 (E.D.N.Y. Sept. 11, 2013).

Therefore, for the same reasons as those given above, the Court finds that there is a genuine issue of fact as to Ruiz's claim for retaliation, but that there is no genuine issue of fact as to Messing's claim.

## III.   Individual Liability

As defendants argue, individuals are not subject to liability under Title VII.  *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004).  Therefore, the Court grants summary judgment for defendants Joseph Frisina, Charles Chapman, and Alex Mullin with regards to the Title VII claims.

However, under the NYSHRL, individuals may be held liable for aiding or abetting discriminatory conduct.  N.Y. Exec. Law § 296(6).  The aiding and abetting provision applies to a co-worker who actually participates in discrimination, regardless of whether that co-worker was an employer.  *See Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004).  An individual may be held liable for their own conduct under the aiding and abetting provision of the NYSHRL, because the predicate liability belongs to the employing organization.  *See Geras v. Hempstead Union Free Sch. Dist.*, 149 F. Supp. 3d 300, 338 (E.D.N.Y. 2015).  As an aiding and abetting statute, § 296(6) requires a showing of discriminatory intent.  *See Edwards v. Khalil*, No. 12-CIV-8442 (JCM), 2016 WL 1312149, at *29 (S.D.N.Y. Mar. 31, 2016).

The record can support a finding that all of the Defendant Chiefs as well as Mullin aided and abetted the hostile work environment.  Mullin made the unwanted sexual advance on Ruiz at the flagpole.  Each of the Chief Defendants signed the settlement between Ruiz and Mullin, and a juror could find that each ultimately bears responsibility for allowing Mullin to flout its terms. In these ways, a juror could find that each individual defendant intended to contribute to an abusive work environment.

The complaint also states a claim for aiding and abetting retaliation.  There is sufficient evidence from which a juror could find that each of the defendants individually abetted retaliation.

As to Frisina and Chapman, there is evidence that Frisina was intimately involved in BSBRA's drafting and enforcement of the agreement, which may have been fatally flawed.  Frisina and Chapman both may have pressured Bonge to stay away from Ruiz.  Fudge testified that Frisina publicly questioned her integrity after she began supporting Ruiz.  There is also evidence that he and Chapman warned Mullin about Ruiz's complaint, and eventually helped him avoid the agreement that he entered into with Ruiz.

As to Rodriguez, there is evidence that he aided the attempt to socially isolate Ruiz, when he told Kunz, Chapman and Frisina to stay away from her.  The record also shows that he permitted Mullin to violate his agreement with Ruiz.

As to Mullin, the record can support a finding that he acted with discriminatory, retaliatory intent towards Ruiz.  He was not involved in the defendant Chiefs' later attempts to isolate Ruiz.  He did, however, violate the agreement, perhaps flagrantly.  The record can support the finding that he did so at least in part to retaliate against Ruiz for her complaint, of which he was well aware.

## IV.    BSBRA May be Held Liable for Punitive Damages

### I.    Sovereign Immunity

Defendants argue that BSBRA is not subject to punitive damages because it is cloaked in sovereign immunity, but there is no evidence in the record that it is a sovereign entity.  The case defendants cite for the proposition that a sovereign entity cannot be subject to punitive damages does not touch upon the issue at all.  *See Jones v. Nat'l Commc'n & Surveillance Networks*, 409

F. Supp. 2d 456, 467 (S.D.N.Y. 2006).  It is clear that Congress intended to breach sovereign immunity when it passed Title VII.  *Fitzpatrick v. Bitzer*, 427 U.S. 445, 455 (1976).  However, the same is not true of punitive damages under Title VII, because such punitive damages are not available against "a government, government agency or political subdivision."  42 U.S.C. § 1981a(b)(1).

The Court agrees, however, that there is no basis for believing that BSBRA is "a government agency" and therefore cloaked in sovereign immunity.  On almost identical facts, the Second Circuit found that a volunteer ambulance company run as a non-profit was not a state actor for purposes of liability under 42 U.S.C. § 1983.  *Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 264–69 (2d Cir. 2014).  This is a compelling analogy. In any case, the record only shows that BSBRA is a non-profit ambulance company.  By definition, a non-profit is not a "government agency," but an independent corporation.  No other facts in the record permit the inference that it is a government agency, and, based on the only fact available, a juror could not find that BSBRA is a government agency.

## II.    The Standard for Punitive Damages under Title VII

Next, defendants argue that plaintiffs have not raised a genuine fact issue as to their entitlement to punitive damages.  The Court disagrees, and finds that there is sufficient evidence from which a juror could conclude that plaintiffs acted with the requisite state of mind for punitive damages.  "A plaintiff may establish the requisite state of mind for an award of punitive damages with evidence (1) that the defendant discriminated in the face of a perceived risk that its actions violated federal law, or (2) of egregious or outrageous acts that may serve as evidence supporting an inference of the requisite evil motive."  *United States v. Space Hunters, Inc.*, 429 F.3d 416, 427 (2d Cir.2005) (internal quotation marks, citation, and brackets omitted).  A

plaintiff may satisfy its burden on the issue of punitive damages with a showing that the employer acted with a "conscious knowledge it was violating the law" or egregious or outrageous behavior from which a factfinder could draw the inference of malice or reckless indifference. *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 101–02 (2d Cir. 2001). Defendants have argued that Ruiz has not carried her evidentiary burden on this issue.

The record shows that several of the chiefs may have connived with Mullin to help him avoid his obligations under a contract that they understood was meant in part to resolve a Title VII issue. There is also evidence that, previously, Rodriguez and Frisina took no action to remove a gingerbread house displayed in a public area that read "sexual harassment in progress" in 2015, strong circumstantial evidence of their general approach to cases of sexual harassment. Along those lines, there is evidence that Frisina heckled Kunz while Kunz was giving a sexual harassment training. From these facts, a juror could infer at least reckless indifference to Ruiz's Title VII rights, if not a conscious knowledge of violating them.

## CONCLUSION

For the above stated reasons, the defendants' motion for summary judgment is denied as to the first, third, and fifth causes of action. Defendants' motion for summary judgment on the second cause of action is granted as to Messing's claim of retaliation and denied as to Ruiz's claim of retaliation. Summary judgment is likewise denied as to the fourth cause of action, for retaliation against Ruiz under the NYSHRL, and granted as to Messing.

As to the individually named defendants, the Court grants summary judgment on the issue of individual liability under Title VII. The Court denies summary judgment on the NYSHRL aiding and abetting claim as to Chapman, Frisina, and Rodriguez.

As to punitive damages, the Court denies the motion for summary judgment.

SO ORDERED.

Dated: Brooklyn, New York
      March 31, 2021

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge